[Cite as *Phillips v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-7061.]

| | |
|---|---|
| JULIUS PHILLIPS | Case No. 2014-00644 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff, formerly an inmate in the custody and control of defendant at the Marion Correctional Institution (MCI), brought this action alleging that on August 2, 2013, Corrections Officer John Sellers negligently inflicted injuries upon him through the excessive use of force. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} At trial, plaintiff testified that on the afternoon of August 2, 2013, he went in the bathroom of his dormitory at MCI and confronted another inmate who had been stealing from him. According to plaintiff, an altercation ensued in which the other inmate and an associate fought plaintiff and eventually struck him several times in the chest and head with a broomstick. Plaintiff characterized his own actions during the altercation as self-defense. Plaintiff stated that after the point at which he suffered a particularly severe blow from the broomstick to the back of the head, he was "out of it" and there is very little that he can recall after that occurred.

{¶3} Plaintiff stated that he remembered there being about four or five inmates in the bathroom when the fight started, but he did not recall seeing the corrections officers who responded to the scene or being in a struggle with Corrections Officer Sellers, although he does recall being sprayed with pepper spray at some point. When shown medical records indicating that he was seen that afternoon at the MCI infirmary and

later at Marion General Hospital, plaintiff testified that he has no recollection of being at either place. (Plaintiff's Exhibits 4, 5.) Plaintiff stated that his memory returned sometime later when he was at the Ohio State University Medical Center (OSUMC), where he remained for several days. Plaintiff testified that he was diagnosed with fractures of multiple facial bones, among other injuries. Plaintiff further testified that he spent two weeks at defendant's Franklin Medical Center after he left OSUMC.

{¶4} Burk Jordan, who testified that he has been an inmate in defendant's custody for 19 years, stated that he lived in the same dormitory as plaintiff and that he witnessed part of the incident. Jordan recounted that upon hearing a commotion, he went in the bathroom to see what was going on, and by that time Corrections Officer Sellers had just entered the bathroom. Jordan stated that he also saw Corrections Officer Tashico White standing outside the bathroom.

{¶5} Jordan testified that Sellers told plaintiff and the other two inmates to stop and activated his "man down" alarm. According to Jordan, plaintiff stood with his hands against the wall, but when Sellers subsequently gave plaintiff at least two orders to "cuff up," or put his hands behind his back so that he could be handcuffed, plaintiff failed to comply and instead kept his hands on the wall and his back to Sellers. Jordan stated that he even told plaintiff himself to cuff up, to no avail. Jordan recalled that the other two inmates involved in the fight were against the wall at this point. Jordan testified that plaintiff seemed "discombobulated," as well as "mad" or "enraged." Jordan also testified that there did not appear to be anything physically wrong with plaintiff at that time and he saw no blood on plaintiff, but that he did not know what had transpired during the preceding fight.

{¶6} As described by Jordan, after about ten seconds Sellers grabbed plaintiff around the waist and threw him to the ground. Jordan related that he had not seen plaintiff wrestle or otherwise put up any resistance to Sellers, and he did not know whether plaintiff had said anything to Sellers. Jordan testified that the side of plaintiff's

face struck the floor when he was taken to the ground, and blood ran out of his nose and mouth onto the floor at that spot. Lieutenant Harper and another corrections officer ran into the bathroom at that point, Jordan stated. Jordan could not recall what Harper did, but he did have some recollection that pepper spray was administered.

{¶7} Tashico White testified that she was employed with defendant as a corrections officer posted in the housing unit known as "5 Dorm" at MCI from June 2013 until August 2015. White explained that she is now employed with the United States Postal Service.

{¶8} As White testified, there were about 115 inmates living in the dormitory and she was the only officer posted there during her shift. White stated that she and Sellers had been monitoring a hallway just outside the dormitory, and when she came back into the dormitory she heard a commotion in the bathroom. White recalled looking into the bathroom and seeing plaintiff collide with a wall, and from what she could see and hear it appeared that a fight was in progress. White testified that she yelled across the hallway to Sellers that there was a fight, and Sellers responded by immediately running from the hallway into the bathroom.

{¶9} White stated that she activated her man down alarm and stood by the door for about one minute, waiting for other officers to respond, and during this time she did not see what was going on inside the bathroom. White remembered going in the bathroom just before Lieutenant Harper, who responded within about 60 to 90 seconds, she said. According to White, when she went in the bathroom plaintiff was standing near the wash bay, he had blood all over his face, and he had his hands over his eyes. White testified that Sellers placed plaintiff against the wall, gave plaintiff multiple orders to cuff up, and tried to get plaintiff's arms behind his back, but plaintiff repeatedly said that he could not see and he kept his hands over his eyes. White related that around the same time that Harper entered the bathroom, Sellers grabbed plaintiff and took him to the ground, and at that time Harper asked her to make way for responding officers.

White stated that she then exited the bathroom and monitored the dormitory. White recalled seeing plaintiff, still bloody, being escorted out of the bathroom and into a wheelchair. White authenticated an Incident Report that she prepared afterward. (Defendant's Exhibit A.)

{¶10} John Sellers testified that he was employed with defendant as a corrections officer from 2009 to 2015, and that he worked at two other prisons before starting at MCI one year before this incident. Sellers related that he now works for Abbott Nutrition. Sellers testified that when he worked for defendant, he received annual training on the use of force. Sellers also testified that defendant has a Use of Force Policy, a copy of which he authenticated. (Defendant's Exhibit J.) Sellers testified regarding the hierarchy of force that may be used by corrections officers under defendant's training and policy, depending on the circumstances, and he stated that one of the grounds upon which an officer may use force is when an inmate fails to comply with orders.

{¶11} Sellers testified that on the day of the incident, he was posted in the housing unit known as "4 Dorm," across the hall from 5 Dorm. Sellers explained that he heard White call out that there was a fight in progress and that she needed assistance, so he responded to the scene. From Sellers' recollection, when he entered the bathroom plaintiff's fists were clenched and there was blood on plaintiff's shirt, although he did not recall seeing blood on plaintiff's face. Sellers stated that he identified himself and gave plaintiff several direct orders to turn around and present his hands to be cuffed, but plaintiff responded with obscenities and stated that he would not comply, plaintiff stood in a boxing stance with one foot planted behind and one in front, and it looked like plaintiff might take a swing at him. Sellers, who stated that he was alone in the bathroom with a number of inmates, testified that he feared for his own safety and the safety of others and, in light of plaintiff's refusal to comply with orders, he used an escort technique that he had been trained on to grab plaintiff by the triceps of one arm

and guide him to the wall. According to Sellers, at no time did plaintiff ever tell him that he could not see.

{¶12} Sellers testified that he was not carrying pepper spray, and he did not see anyone else use pepper spray during the incident. Sellers' testimony was that after he put plaintiff against the wall, plaintiff wrestled with him and tried to pull away, and plaintiff continued to ignore his commands to cuff up. Sellers stated that, in order to gain control of plaintiff he placed plaintiff on the ground by putting his hands on plaintiff's triceps and using his body weight to pull plaintiff down, but even after that plaintiff continued to resist until additional officers arrived, whereupon he was able to put handcuffs on plaintiff. As Sellers testified, plaintiff was then escorted to the infirmary, which is the standard procedure when there has been a use of force.

{¶13} Sellers testified that he prepared an Incident Report afterward, and he also prepared a Conduct Report charging plaintiff with violating administrative rules, specifically Rule 20 ("Physical resistance to a direct order") and Rule 21 ("Disobedience of a direct order"). (Defendant's Exhibits B, D.)

{¶14} Lieutenant Craig Harper testified that he has been employed with defendant for 20 years and was promoted to his current rank in 2011. Harper explained that he now works at the London Correctional Institution, but at the time relevant to this case he worked at MCI. As a lieutenant, Harper stated, he works under the shift captain to assist in the operation of the prison, and he supervises the corrections officers and sergeants working under him. Harper testified that he regularly receives training on how to interact with inmates, including training on the use of force, and he described the varying applications and degrees of force comprising the use of force continuum which defendant uses to train its employees. Harper authenticated a copy of defendant's Use of Force Policy. (Defendant's Exhibit J.)

{¶15} Harper stated that he was alerted to the incident when an alarm was sent out from the MCI control room. Harper recalled that he was in the captain's office when

that occurred, and he immediately ran to the scene. According to Harper, he looked through a window as he approached the bathroom and saw plaintiff and Sellers wrestling with one another while still standing, but by the time he got inside the bathroom they were on the ground and plaintiff continued to wrestle, despite Sellers giving orders to stop resisting. Harper testified that there were several other inmates in the bathroom and the scene was somewhat chaotic, so he ordered the other inmates to leave, and he testified that he announced to plaintiff who he was and he told plaintiff to stop resisting. Plaintiff continued to struggle against Sellers, Harper stated, so he administered a short burst of pepper spray toward plaintiff, lasting no more than one second, and finally plaintiff stopped resisting. Harper testified that medical personnel were requested for plaintiff, who had blood on his face, as it was standard policy to have an inmate assessed following a use of force.

{¶16} Harper stated that he remained at the scene to make sure the dormitory was secure, to gather information about what happened, and to make sure that no responding officers were injured. Harper testified that he prepared an Incident Report afterward. (Defendant's Exhibit C.)

{¶17} "To recover on a negligence claim, a plaintiff must prove by a preponderance of the evidence (1) that a defendant owed the plaintiff a duty, (2) that a defendant breached that duty, and (3) that the breach of the duty proximately caused a plaintiff's injury." *Ford v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 05AP-357, 2006-Ohio-2531, ¶ 10. "Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being." *Ensman v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 06AP-592, 2006-Ohio-6788, ¶ 5.

{¶18} In addition to stating a claim for negligence, allegations of unnecessary or excessive force being used against an inmate may state a claim for battery. *Brown v. Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 13AP-804, 2014-Ohio-1810, ¶ 13. "To prove battery, the plaintiff must prove that the intentional contact by the defendant was

harmful or offensive." *Miller v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-12, 2012-Ohio-3382, ¶ 11. "A defendant may defeat a battery claim by establishing a privilege or justification defense." *Brown* at ¶ 13, citing *Love v. Port Clinton*, 37 Ohio St.3d 98, 99 (1988).

{¶19} "The use of force is sometimes necessary to control inmates." *Jodrey v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-477, 2013-Ohio-289, ¶ 17. "Correctional officers considering the use of force must evaluate the need to use force based on the circumstances as known and perceived at the time it is considered." *Brown* at ¶ 15, citing Ohio Adm.Code 5120-9-01(C). "[T]he precise degree of force required to respond to a given situation requires an exercise of discretion by the corrections officer." *Ensman* at ¶ 23. "In Ohio Adm.Code 5120-9-01, the Ohio Administrative Code sets forth the circumstances under which correctional officers are authorized to use force against an inmate." *Id.* at ¶ 6.

{¶20} Ohio Adm.Code 5120-9-01 provides, in pertinent part:

{¶21} "(C) Guidelines regarding the use of force. * * *

{¶22} "* * *

{¶23} "(2) Less-than-deadly force. There are six general circumstances in which a staff member may use force against an inmate or third person. A staff member may use less-than-deadly force against an inmate in the following circumstances:

"(a) Self-defense from physical attack or threat of physical harm.

"(b) Defense of another from physical attack or threat of physical attack.

"(c) When necessary to control or subdue an inmate who refuses to obey prison rules, regulations or orders.

"(d) When necessary to stop an inmate from destroying property or engaging in a riot or other disturbance.

"(e) Prevention of an escape or apprehension of an escapee; or

"(f) Controlling or subduing an inmate in order to stop or prevent self-inflicted harm."

{¶24} "Pursuant to Ohio Adm.Code 5120-9-01(C)(1)(a), correctional officers 'may use force only to the extent deemed necessary to control the situation.' Additionally, correctional officers 'should attempt to use only the amount of force reasonably necessary under the circumstances to control the situation and shall attempt to minimize physical injury.' Ohio Adm.Code 5120-9-01(C)(1)(b)." *Brown* at ¶ 16. Also pertinent is Ohio Adm.Code 5120-9-01(B)(3), which defines "excessive force" as "an application of force which, either by the type of force employed, or the extent to which such force is employed, exceeds that force which reasonably appears to be necessary under all the circumstances surrounding the incident."

{¶25} Upon review of the evidence presented at trial, the magistrate finds as follows. On August 2, 2013, plaintiff was an inmate assigned to the 5 Dorm dormitory at MCI. Corrections Officer White was the only officer on duty in the dormitory during the second shift that day. At approximately 4:30 p.m., White went to monitor the hallway just outside the dormitory. At that time, plaintiff chose to enter the bathroom of the dormitory and initiate a confrontation with another inmate whom plaintiff accused of stealing. A two-on-one fight ensued in which the other inmate and his associate used a broomstick as a weapon to inflict several severe blows to plaintiff's head and upper body.

{¶26} Upon reentering the dormitory, White discovered the fight and shouted out to Corrections Officer Sellers, who was in the hallway, and she activated her man down alarm. Sellers ran to the bathroom, while White stood by the door and waited for responders to arrive. The fight ended when Sellers entered the bathroom, but plaintiff, unlike the other two combatants, continued to act aggressively and failed to comply with Sellers' instructions. Indeed, plaintiff crudely told Sellers that he would not comply. There were numerous inmates in the bathroom at this point, but Sellers, having been so

close to the dormitory to begin with, was the only staff member on the scene. The witnesses' varying recollections demonstrate the chaotic nature of the scene.

{¶27} After plaintiff failed to comply with multiple orders to turn and face the wall, Sellers grabbed plaintiff by the triceps and guided him to the wall. Plaintiff physically resisted Sellers and would not comply with orders to put his hands behind his back to be cuffed, even at the urging of inmate Jordan. Sellers grabbed plaintiff by the triceps of each arm and pulled plaintiff to the ground, where plaintiff continued to struggle against Sellers and resist being cuffed. Lieutenant Harper, the second staff member to respond, entered the bathroom at this time and ordered plaintiff to stop resisting. Plaintiff's belligerence was such that he continued resisting, however, until Harper administered a short burst of pepper spray. Plaintiff was thereupon handcuffed by Sellers. Plaintiff was seen by MCI medical personnel and was later transported to a local hospital for treatment.

{¶28} Sellers was justified and privileged to use force based upon plaintiff's refusals to comply with orders, combined with plaintiff's threatening body language and demeanor. Whether or not plaintiff was disoriented from being struck in the head with the broomstick, he was conscious and remained on his feet, he made defiant statements and reacted toward Sellers in a way that was reasonably perceived as threatening by Sellers, who knew nothing about what transpired during the fight and was alone with many inmates in an unstable environment. Furthermore, the degree of force used by Sellers was not excessive and satisfied the duty of reasonable care. Sellers' first objective when entering the bathroom was to de-escalate the situation, and by his presence and commands he stopped the fight. Sellers then initially used verbal commands with plaintiff, and when that proved ineffective he used minimal force to guide plaintiff to the wall. Even though Sellers again used verbal commands in an effort to handcuff plaintiff, plaintiff continued to resist, and only then did Sellers progress to placing plaintiff on the ground.

{¶29} There was some argument at trial about plaintiff having blood in his eyes and thus not being able to see Sellers, but even if that were true it is of little significance, as Sellers announced who he was upon entering the bathroom, plaintiff could hear Sellers' orders, and it was not shown that any visual impairment from having blood in his eyes would have prevented plaintiff from complying with Sellers' orders.

{¶30} Although Sellers is the only MCI staff member identified in the complaint, to the extent that the issues at trial also included the actions of Harper the magistrate makes the finding that Harper was justified and privileged to use force, and that the force used by Harper was not excessive and satisfied the duty of reasonable care. When Harper arrived, the situation in the bathroom remained somewhat chaotic and plaintiff was on the ground struggling with Sellers. Harper initially used verbal commands to try to get plaintiff to stop resisting and submit to being handcuffed, and only after plaintiff refused those orders did Harper administer a short burst of pepper spray.

{¶31} Lastly, even if plaintiff had proven that Sellers was not justified or privileged in his use of force, one can only speculate whether plaintiff suffered any distinct injury as a result. Plaintiff was badly beaten in the head and upper body with a weapon by two other inmates before Sellers arrived, and credible evidence to differentiate the cause of his injuries is lacking. Moreover, from Sellers' description, plaintiff was not thrown to the ground as plaintiff claims. While inmate Jordan claimed that plaintiff was slammed to the ground face-first, Sellers' account was more persuasive.

{¶32} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence. Accordingly, judgment is recommended in favor of defendant.

{¶33} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files*

*objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

                          _____

                          ROBERT VAN SCHOYCK
                          Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Amy S. Brown
James P. Dinsmore
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed August 16, 2016**
**Sent To S.C. Reporter 9/29/16**